UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JERRY CREW,                          )
                                     )
            Plaintiff,               )
                                     )
     vs.                             )          Case No. 4:13-CV-1368-CEJ
                                     )
TERRY RUSSELL, et al.,               )
                                     )
            Defendants.              )

## MEMORANDUM AND ORDER

This matter is before the Court on the motions of defendants Charles Chastain, Pascha Allen, Roschell Davis, and Margaret Huff for summary judgment. Plaintiff has responded in opposition to the motions, and the issues are fully briefed.

## I.    Background

Plaintiff Jerry Crew, an inmate in the custody of the Missouri Department of Corrections (MDOC), brings this action under 42 U.S.C. § 1983 against defendants Dr. Charles Chastain, nurse Pascha Allen and medical administrator Roschell Davis—all of whom are Corizon, Inc. employees—and Margaret Huff, a custody officer at the Eastern Reception Diagnostic and Correctional Center (ERDCC). Plaintiff claims that the defendants were deliberately indifferent to his serious medical needs.

According to the amended complaint, upon his arrival to the ERDCC on April 19, 2009, plaintiff notified medical staff that he took prescription medicine to treat ulcerative colitis. In his first three weeks at the ERDCC, plaintiff made multiple requests for his medication that were denied. As a result, plaintiff suffered severe stomach pains, vomiting, diarrhea, an inability to eat solid food for 18 days, severe headaches, weight loss, and an inability to walk. Plaintiff self-declared a medical emergency and requested medical care. Huff refused to contact medical staff and informed plaintiff that his

situation was not a medical emergency. She also threatened to issue plaintiff a conduct violation if he self-declared a medical emergency again. Nevertheless, plaintiff filed a medical services request and his paperwork was forwarded to Chastain.

Due to the decline in his health and significant weight loss, Chastain admitted plaintiff to the prison infirmary for two weeks, during which time he was unable to hold down a meal and defecated bloody stools. Plaintiff requested to be sent to an outside hospital, but Chastain denied the request. Eventually, plaintiff was sent to the emergency room at a hospital where it was determined that plaintiff needed immediate surgery to remove his colon. He was advised that he may not survive the surgery, because his colon was three times its normal size and had holes leaking blood and feces into his body.

Since the removal of his colon and his transfer to the Northeast Correctional Center (NECC) on April 12, 2012, plaintiff has been required to wear a colostomy bag. Plaintiff alleges that Davis and Allen have denied him access to new, clean colostomy bags and forced him to clean his colostomy bag in the sink of his prison cell where he and his cellmate wash their faces and brush their teeth.

In their motions, the defendants argue that the uncontroverted material facts establish they responded to plaintiff's medical needs and plaintiff cannot demonstrate that they were deliberately indifferent. Additional facts pertinent to the defendants' motions are set forth below.

## II. Legal Standards

### A. Summary Judgment

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall be entered if the moving party shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a

motion for summary judgment, the court is required to view the facts in the light most favorable to the non-moving party, giving that party the benefit of all reasonable inferences to be drawn from the underlying facts. AgriStor Leasing v. Farrow, 826 F.2d 732, 734 (8th Cir. 1987). The moving party bears the burden of showing both the absence of a genuine issue of material fact and its entitlement to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986). If the moving party meets its burden, the non-moving party may not rest on the allegations of its pleadings, but must set forth specific facts, by affidavit or other evidence, showing that a genuine issue of material fact exists. Gannon Intern., Ltd. v. Blocker, 684 F.3d 785, 792 (8th Cir. 2012); Gibson v. American Greetings Corp., 670 F.3d 844, 853 (8th Cir. 2012). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Ricci v. DeStefano, 557 U.S. 557, 586 (2009) (quoting Matsushita Elec. Indus. Co., 475 U.S. at 587).

### B. Deliberate Indifference

"It is well established that the Eighth Amendment prohibition on cruel and unusual punishment extends to protect prisoners from deliberate indifference to serious medical needs." Gregoire v. Class, 236 F.3d 413, 417 (8th Cir. 2000) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)). "This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle, 429 U.S. at 104.

Deliberate indifference involves both an objective and a subjective analysis. Jackson v. Buckman, 756 F.3d 1060, 1065 (8th Cir. 2014). The objective component requires a plaintiff to demonstrate an objectively serious medical need. Id. "A medical

need is objectively serious if it either has been 'diagnosed by a physician as requiring treatment' or is 'so obvious that even a layperson would easily recognize the necessity for a doctor's attention.'" Scott v. Benson, 742 F.3d 335, 340 (8th Cir. 2014) (quoting Coleman v. Rahija, 114 F.3d 778, 784 (8th Cir. 1997)).

"When the inmate alleges that a delay in medical treatment rises to the level of an Eighth Amendment violation, 'the objective seriousness of the deprivation should also be measured by reference to the *effect* of delay in treatment.'" Laughlin v. Schriro, 430 F.3d 927, 929 (8th Cir. 2005) (quoting Beyerbach v. Sears, 49 F.3d 1324, 1326 (8th Cir. 1995)). "To establish this effect, the inmate 'must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment.'" Id. (quoting Crowley v. Hedgepeth, 109 F.3d 500, 502 (8th Cir. 1997)). An inmate's suit in such a case must fail if he does not present any "verifying medical evidence . . . that defendants ignored an acute or escalating situation or that delays adversely affected his prognosis." Reece v. Groose, 60 F.3d 487, 491 (8th Cir. 1995) (quoting Beyerbach, 49 F.3d at 1326).

"The subjective component requires a plaintiff to show that the defendant actually knew of, but deliberately disregarded, such need." Vaughn v. Gray, 557 F.3d 904, 908 (8th Cir. 2009). The prison official or medical provider "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Bender v. Regier, 385 F.3d 1133, 1137 (8th Cir. 2004) (quoting Farmer v. Brennan, 511 U.S. 825, 837 (1994)). The prisoner "must show more than negligence, more even than gross negligence." Popoalii v. Corr. Med. Servs., 512 F.3d 488, 499 (8th Cir. 2008) (quoting Estate of Rosenberg v. Crandell, 56 F.3d 35, 37 (8th Cir. 1995)). The prisoner must establish that the defendant possessed "a mental state akin to criminal recklessness." Vaughn, 557 F.3d at 908 (quoting Gordon v. Frank,

454 F.3d 858, 862 (8th Cir. 2006)). "[M]ere disagreement with treatment decisions does not rise to the level of a constitutional violation." Popoalii, 512 F.3d at 499 (quoting Estate of Rosenberg, 56 F.3d at 37).

### III. Discussion

#### A. Defendant Chastain

Chastain argues that he is entitled to judgment as a matter of law, because the undisputed facts show he prescribed plaintiff Asacol[1] on the date of his arrival to the ERDCC. Thereafter, Chastain asserts he continued to monitor and treat plaintiff's ulcerative colitis with prescription medications until he transferred plaintiff to a local hospital because plaintiff was not responding to medication and plaintiff's bloodwork indicated that he was anemic. Chastain contends that the hospital physicians treated plaintiff in the same manner as he had, and plaintiff did not undergo surgery until six days after plaintiff's admission. As such, Chastain argues that he responded to plaintiff's medical condition with continued examinations and treatment and did not ignore a serious medical need.

When a prisoner asserts that the medical care he received was constitutionally inadequate, "a plaintiff can show deliberate indifference in the level of care provided in different ways, including showing grossly incompetent or inadequate care, showing a defendant's decision to take an easier and less efficacious course of treatment, or showing a defendant intentionally delayed or denied access to medical care." Allard v. Baldwin, 779 F.3d 768, 772 (8th Cir. 2015) (internal citations omitted). Alternatively, when a prisoner asserts that he was deprived medical treatment, a prisoner may prove deliberate indifference by showing that the deprivation of medical care resulted in "pain and

---

1 Asacol, the brand name for Mesalamine, is an anti-inflammatory agent used to treat ulcerative colitis, a condition that causes swelling and sores in the lining of the colon and rectum. Chastain Dep. 19:8–20:4; http://www.nlm.nih.gov/medlineplus/druginfo/meds/a688021.html (last visited May 5, 2015).

suffering" or "a lingering death."  Langford v. Norris, 614 F.3d 445, 460 (8th Cir. 2010)

(quoting Estelle, 429 U.S. at 103).  A defendant's "'mere proof of medical care' is

insufficient to disprove deliberate indifference."  Allard, 779 F.3d at 772 (quoting Smith

v. Jenkins, 919 F.2d 90, 93 (8th Cir. 1990)).  As such, "in cases where some medical care

is provided, a plaintiff 'is entitled to prove his case by establishing [the] course of

treatment, or lack thereof, so deviated from professional standards that it amounted to

deliberate indifference.'"  Id. (quoting Smith, 919 F.2d at 93).  "Often whether such a

significant departure from professional standards occurred is a factual question requiring

expert opinion to resolve."  Moore v. Duffy, 255 F.3d 543, 545 (8th Cir. 2001).

With respect to the objective component of deliberate indifference, the undisputed

facts in the record demonstrate that plaintiff had an objectively serious medical needs

diagnosed by a physician as requiring treatment.  Plaintiff was diagnosed with diabetes

mellitus type 1 and ulcerative colitis and prescribed ongoing medications to treat these

conditions prior to his admission to the ERDCC.  Chastain and Pribble 00112 [Doc.

##72-5-6, 78-2-3]; Crew Dep. 16:8–17:1, 52:24–53:13, 56:25–57:8 [Doc. ##72-4,

78-1]; Chastain Dep. 42:5-8 [Doc. ##72-1, 78-4].  Chastain received plaintiff's

prescription record from the county jail upon his admission to the ERDCC and ordered the

medications needed to manage plaintiff's diabetes and ulcerative colitis.  Crew Dep.

59:14–17; Chastain Dep. 70:6–11; Chastain and Pribble 00073, 00077, 00112.  Thus,

Chastain had knowledge of plaintiff's diagnosed conditions.  Furthermore, medical

evidence in the record establishes the detrimental effect of the delay in providing effective

medical treatment for plaintiff's exacerbated ulcerative colitis.  Plaintiff developed a toxic

megacolon[2] that was removed during an emergency surgery he was told he might not

---

2 A toxic megacolon occurs when inflammation is present through the entire wall of the colon, causing
the colon to become dilated or swollen.  Muscles break down in the colon and the colon starts absorbing
toxic chemicals from fecal matter in the colon that normally do not enter a person's circulation or

survive, which resulted in an infection and additional necessary surgery. Chastain and Pribble 01047, 01049, 01056, 01059, 01064–67; Crew Dep. 76:18–77:10. Plaintiff, who was 24 years old on the date of his hospital admission, now has to use an ileostomy bag for the remainder of his life. Chastain and Pribble 01064–67; Chastain Dep. 33:9–34:3; Crew Dep. 78:16–22 (referring to his ileostomy bag as a "colostomy bag" throughout the record). As such, the objective prong of deliberate indifference is met.

With regard to the subjective component of deliberate indifference, plaintiff is entitled to prove his case against Chastain by establishing that the course of treatment he received so deviated from professional standards that it amounted to deliberate indifference. See Allard, 779 F.3d at 772 (quoting Smith, 919 F.2d at 93). Defendant Chastain, as the moving party, has failed to establish the absence of a genuine factual dispute as to whether the medical care he provided plaintiff and his delay in sending plaintiff to receive care at an outside hospital so deviated from professional standards that his conduct amounted to deliberate indifference.

The record shows that prior to his role as the medical director at the ERDCC, Chastain's medical practice focused mainly on obstetrics, pediatrics, and general family practice. Chastain Dep. 11:11–13:15. Chastain received his medical degree in 1956 and has seen approximately six to eight cases of ulcerative colitis throughout his medical career. Chastain Dep. 6:12–16, 14:23–15:10. There is no evidence in the record that Chastain has ever treated a patient with both type 1 diabetes and ulcerative colitis. Chastain stated in his deposition that Asacol and Balsalazide are medications used to control ulcerative colitis by releasing chemicals in the large intestine to counteract the inflammatory process, but these medications must be taken regularly to work. Chastain Dep. 19:8–20:17, 22:2–9. The record indicates a remaining factual dispute as to

bloodstream. Chastain Dep. 17:24–19:4, 46:11–23, 50:18–22.

whether plaintiff received his prescribed Asacol, essential to managing his ulcerative colitis,[3] for approximately two weeks in April while he was kept in administrative segregation.[4]

Chastain is not a specialist in treating ulcerative colitis. Chastain Dep. 23:13–15. Chastain admitted that if a close family member had ulcerative colitis, "it would not be ethical" for him to treat such a person since "it would be like treating them for cancer or something." Chastain Dep. 23:16–22. Instead, he would refer a patient with ulcerative colitis to a gastroenterologist, a specialist in intestinal diseases. Chastain Dep. 23:23–24:10. If a prisoner needed to see a gastroenterologist, prison authorities would have to decide to send him to see one. Chastain Dep. 25:2–16. As the medical director of the ERDCC, Chastain has the authority to decide if a prisoner is facing a medical emergency and needs outside medical attention. Chastain Dep. 9:12–18, 65:23–66:13. Chastain primarily made the eventual decision to transfer plaintiff from the prison infirmary to an outside hospital for treatment. Chastain Dep. 28:11–29:6.

In his deposition, Chastain stated that the signs or symptoms indicating that a case of ulcerative colitis is progressing and becoming more serious include pain, increased bloody diarrhea, and weight loss. Chastain Dep. 27:22–28:4, 42:9–18. If he saw a patient experiencing those symptoms, Chastain acknowledged that it would mean the patient was becoming seriously ill with his ulcerative colitis. Chastain Dep. 28:5–10.

---

3 When plaintiff was initially diagnosed with ulcerative colitis and prescribed Mesalamine and Prednisone, medical providers at Saint Louis University Hospital (SLUH) discussed potential complications of ulcerative colitis with plaintiff, informing him that he could end up with a bag or die of his condition was not properly managed. Chastain and Pribble 00112; Crew Dep. 16:8–17:1, 56:25–57:8, 58:17–59:1.

4 The medical record shows that plaintiff received his twice-daily doses of Asacol on April 17, 18, 19, and 20. Chastain and Pribble 01005. On April 20, an order was issued for plaintiff to keep Asacol on his person for self-administration. Id.; Crew Dep. 63:12–64:18. On the same date, however, plaintiff was placed in administrative segregation and remained there for at least ten days. Chastain and Pribble 00078; Crew Dep. 68:1–69:2, 80:16–19. When a prisoner is in administrative segregation, medication is provided to the prisoner through the cell door. Crew Dep. 69:3–70:9. Plaintiff states that while he was in administrative segregation he did not receive Asacol as prescribed. Crew Dep. 80:3–19.

The undisputed facts in the record show that plaintiff began experiencing these symptoms on June 26, 2009 and the symptoms worsened or persisted in both intensity and frequency with the passage of time. Chastain and Pribble 00093–135. Plaintiff told medical staff that he had been unable to eat solid food for 18 days prior to his admission to the prison infirmary, or beginning approximately on June 15, 2009. Crew Dep. 29:2–34:2, 73:15–74:5. The infirmary admission notes indicate that plaintiff had reported vomiting and diarrhea to medical staff for eight days. Chastain and Pribble 00100–101. Despite his recognition that plaintiff was experiencing an exacerbation of his ulcerative colitis, Chastain continued to prescribe plaintiff over-the-counter medication as part of his treatment plan until he transferred plaintiff to an outside hospital. E.g., Chastain and Pribble 00096, 00119, 00134. Chastain did not transfer plaintiff to an outside hospital where he could be seen by a specialist for his condition until July 15, 2009, or approximately one month after plaintiff was unable to eat solid foods and his symptoms of exacerbated ulcerative colitis began.

While Chastain escalated plaintiff's treatment by admitting him to the TCU or prison infirmary on July 3, 2009, Chastain acknowledged that the medical care that plaintiff needed, including surgeries, such as the placement of a PICC line[5] to more efficiently administer medication, total parenteral nutrition, CT scans or MRIs, and immediate lab work, could not be provided at the TCU. Chastain Dep. 27:8–21, 31:24–32:6, 83:14–25, 85:14–20. The difference in plaintiff's lab tests conducted across more than a week at the TCU, with days-long delays between Chastain ordering the tests, the tests occurring, and the ERDCC receiving the results, demonstrated plaintiff's marked anemia and triggered Chastain's recognition of plaintiff's immediate need for hospitalization. Chastain Dep. 83:14–25; Chastain and Pribble 00134. At the hospital, plaintiff was

---

5 A PICC line is a special apparatus inserted into a large vein to deliver medicine inside the body. Chastain Dep. 31:18–23.

provided treatment that Chastain could not provide at the ERDCC—specifically, PICC lines were inserted in plaintiff for medication and total parenteral nutrition to be administered intravenously and a CT scan was used by a gastroenterologist to diagnose his toxic megacolon. Chastain and Pribble 01059–62 [Doc. #78-5]; cf. Green v. Norris, No. 99-2263, 2000 WL 254411, at *1 (8th Cir. 2000) (finding that a plaintiff-prisoner had not established a constitutional violation when he "consistently received consultations with medical specialists, diagnostic tests, and medical and other treatments, and that he refused surgery recommended by an outside specialist").

During the 12 days plaintiff spent in the infirmary at the ERDCC, Chastain, the sole physician to treat plaintiff in the TCU, checked on plaintiff during his rounds, but only in the mornings and on weekdays. Chastain Dep. 78:22–79:10. In his deposition, plaintiff stated that his condition never improved and his pain never subsided while he was in the TCU. Crew Dep. 75:19–76:1 ("I was in so much pain, I don't even know how to describe the pain. I was wanting to die . . . ."); Chastain and Pribble 00126 (expressing a wish to die in the infirmary on July 13, 2009). On July 9, six days after his admission to the TCU and six days before he was transferred to the hospital, plaintiff expressed the severity of his pain by asking an infirmary nurse why his colon could not simply be removed. Chastain and Pribble 00120 ("When are they going to do something? I can't stand this anymore. Why can't they just cut it out?"). The differences in plaintiff's two lab tests in the TCU on July 6 and July 14 indicate that plaintiff developed leukocytosis and marked anemia despite any medical treatment attempted by Chastain. Compare Chastain and Pribble 00107–108 with Chastain and Pribble 00128–31; see also Chastain and Pribble 00134. Plaintiff also lost approximately 40 pounds from the date of his admission to the ERDCC in April 2009 to the date of his emergency surgery at the hospital in July 2009. Crew Dep. 57:13–20; Chastain and Pribble 00126 (Chastain noting that plaintiff's weight

was down 35 pounds on July 13); Chastain and Pribble 01060, 01062 [Doc. #78-5] ("His weight used to be in the low 200s; about four months ago he weigh[ed] about 175 pounds, now he is down to about 138 pounds."). Chastain understood that a toxic megacolon would kill a person if it was not timely removed. Chastain Dep. 17:24–19:4, 48:21–49:3.

After careful review of the evidence in the record, the Court finds a remaining genuine dispute of material fact as to whether the treatment Chastain provided and his failure to send plaintiff to the hospital sooner so deviated from the appropriate standard of care for plaintiff's condition that it constituted gross incompetence and amounted to deliberate indifference. See Smith, 919 F.2d at 94 (reversing a grant of summary judgment in finding that the record did not show that a prison physician's actions indisputably complied with the prisoner's Eighth Amendment rights when the record lacked evidence of the appropriate standard of care or indication of whether the defendant physician's actions amounted to deliberate indifference as measured by that standard). A reasonable jury could find that the treatment Chastain provided to plaintiff was so inadequate, incompetent, or otherwise so deviated from professional standards that it amounted to deliberate indifference. See Langford, 614 F.3d at 450–51, 460–61 (finding that a plaintiff-prisoner had a "sound theory" of a constitutional violation for "grossly incompetent" medical care when he had ongoing severe stomach pain and vomiting blood for which plaintiff repeatedly complained and submitted grievances, but was give only antacid tablets). Accordingly, defendant Chastain is not entitled to judgment as a matter of law.

### B.    Defendant Huff

Plaintiff asserts that defendant Huff was deliberately indifferent to his medical needs by turning him away from the medical unit when he first self-declared a medical

emergency for his ulcerative colitis in June 2009.  Plaintiff claims that Huff told him that his condition was not a medical emergency and threatened to issue him a conduct violation if he self-reported an emergency again.  Huff argues that she is entitled to judgment as a matter of law with respect to plaintiff's claim against her, because plaintiff cannot show that Huff was deliberately indifferent, plaintiff failed to exhaust his administrative remedies, and she is entitled to qualified immunity.

Plaintiff was diagnosed with diabetes in 2007, informed that he had ulcerative colitis in February 2009 and admitted to the ERDCC on April 17, 2009.  Crew Dep. 16:8–17:1, 19:9–22, 59:14–17; Chastain and Pribble 00073–77, 00112 [Doc. #76-2].  At all times relevant to the complaint, Huff was a custody officer stationed at the front desk of the medical unit at the ERDCC.  Crew Dep. 27:24–28:6; Huff Dep. 7:14–15, 11:11–16 [Doc. ##71-3, 76-6].  Plaintiff regularly saw Huff in the mornings when he went to the medical unit to receive insulin shots for his diabetes.  Crew Dep. 27:10–28:3; Chastain and Pribble 00073–99.  Huff was responsible for signing in and watching inmates in the waiting area who came to the medical unit for appointments or who self-declared medical emergencies.  Huff Dep. 7:16–23.  Over 100 inmates went to the medical unit at the ERDCC each day.  Huff Dep. 8:8–12.  In her deposition, Huff testified that she had no knowledge of plaintiff's health issues.  Huff Dep. 8:4–12.  Huff also asserted that she does not know what ulcerative colitis and Asacol are.  Huff Dep. 17:14–18:4.

During his regular morning visits to the medical unit for insulin, it is undisputed that plaintiff was able to speak with medical staff about any health issues he was experiencing with his ulcerative colitis.  Crew Dep. 39:9–15.  Huff did not deal with any medical records or the inmates' medical treatment in the health unit.  Huff Dep. 7:24–8:1, 9:4–10:1; Crew Dep. 42:11–17, 43:5–9.  She had no role in deciding which inmates were seen by doctors or nurses in the medical unit and never prevented plaintiff from seeing the

doctor.  Huff Dep. 12:19–22, Crew Dep. 39:22–24.  Her job at the front desk of the medical unit was limited to custody and security.  Huff Dep. 10:20–21, Crew Dep. 42:18–25.

On June 26, 2009, plaintiff went directly to the health unit after breakfast and claims he told Huff that he needed to self-declare a medical emergency for his ulcerative colitis since he had been unable to eat solid food for one to two weeks and was experiencing bloody stool and stomach pains.  Crew Dep. 21:20–24, 28:10–29:21, 35:16–36:21.  Plaintiff also asked Huff if he could use the bathroom in the medical unit.  Crew Dep. 36:1–10.  Huff told plaintiff that she could not unlock the bathroom for him, that he should return to his cell since no nurses were available to see him, and that his stomach pains were not a medical emergency.  Crew Dep. 36:8–21, 39:25–40:12.  Plaintiff claims Huff also stated that she would issue him a conduct violation if he self-declared a medical emergency for his stomach pains again.  Crew Dep. 40:17–41:23.  If an inmate receives a conduct violation at the ERDCC, he may be sent to administrative segregation. Crew Dep. 44:3–17.

Plaintiff does not recall ever receiving a conduct violation for self-reporting a medical emergency during the relevant period of time in the complaint.  Crew Dep. 26:21–27:7.  Huff never wrote plaintiff a conduct violation for self-declaring a medical emergency, although plaintiff feared she would.  Crew Dep. 50:4–14.  Prior to the alleged incident, Huff had issued plaintiff a conduct violation on April 20, 2009 for his behavior in the waiting area of the medical unit, for which he was placed in administrative segregation.  Conduct Violation Report [Doc. #76-5]; Crew Dep. 43:20–44:7, 50:4–7.  Thus, plaintiff avoided self-declaring a medical emergency while Huff was on duty.  Crew Dep. 50:1–25.  In her deposition, Huff acknowledged that inmates could receive conduct violations if they falsely self-declared a medical emergency and also become loud or

argumentative.   Huff Dep. 16:10–23.   However, Huff could not issue a conduct violation for a falsely alleged medical emergency unless a nurse or doctor instructed her to do so. Huff Dep. 20:7–21:1.

After plaintiff's attempt to self-declare a medical emergency in the medical unit on June 26, he did not have further contact with Huff.   Crew Dep. 37:12–20.   Plaintiff's claim against Huff thus is solely related to her conduct on June 26 in the medical unit at the ERDCC in refusing to unlock the bathroom for him, ordering him to return to his cell since his stomach pains were not a medical emergency, and threatening to issue him a conduct violation if he self-declared a medical emergency again.   Crew Dep. 44:14–19. Plaintiff is unable to establish a claim of deliberate indifference against Huff based on her conduct during this single incident.

To succeed on his deliberate indifference claim against Huff, plaintiff would need to show that Huff actually knew of but deliberately disregarded plaintiff's serious medical needs.   See Vaughn, 557 F.3d at 908.   Plaintiff would need to establish that Huff possessed "a mental state akin to criminal recklessness: disregarding a known risk to the inmate's health."   Id. (quoting Gordon, 454 F.3d at 862).   Plaintiff cannot establish the subjective prong of deliberate indifference since it is undisputed that Huff was unaware of what ulcerative colitis was and could not access plaintiff's medical records in the health unit.   She was solely responsible for custody and security in her role as the front desk officer in the health unit.   While plaintiff states that he told Huff he had ulcerative colitis, stomach pains, bloody stool, and needed to use the restroom, there is no evidence in the record indicating that Huff would have recognized that plaintiff needed immediate medical attention.

Furthermore, plaintiff had a variety of other means available to him by which to seek medical attention for his ulcerative colitis, such as by voicing a complaint during his

regular morning visits to the health unit for insulin shots or by filing a formal medical services request. Even if Huff threatened to issue plaintiff a conduct violation if he attempted to self-declare another medical emergency, it is undisputed that Huff never cited him a conduct violation for filing medical service requests or self-declaring a medical emergency. Plaintiff later self-declared a medical emergency the evening of the same date Huff allegedly denied him access to the health unit, and thereafter was seen by a nurse and provided medication for his symptoms. Chastain and Pribble 00095–96. Accordingly, because the undisputed facts in the record show that plaintiff cannot establish a claim of deliberate indifference against Huff, she is entitled to judgment as a matter of law with regard to plaintiff's claim against her.

Because the Court has concluded that it is appropriate to grant summary judgment to defendant Huff for the reasons discussed above, it is unnecessary to consider defendant's other bases for judgment in her favor.

### C. Defendants Allen and Davis

Plaintiff also asserts that defendants Allen and Davis were deliberately indifferent to his serious medical needs by failing to provide him adequate medical supplies and by improperly instructing him on the use of those supplies. Allen and Davis argue that they are entitled to judgment as a matter of law, because they did not deny plaintiff colostomy supplies, they did not instruct plaintiff on the care of his colostomy bag, and plaintiff cannot demonstrate any damages.

At all times relevant to the complaint, Davis was employed by Corizon as the health services administrator at the NECC. Davis Dep. 11:21–23 [Doc. ##72-2, 78-7]. Davis oversaw the medical unit and supervised medical staff. Davis Dep. 11:21–12:9. Allen was employed by Corizon as a nurse at the NECC. Allen Dep. 6:14–7:6 [Doc. ##72-3, 78-8]. Allen was responsible for coordinating the care for and providing health care

education to inmates enrolled in a chronic care clinic.   Allen Dep. 9:11–10:2.   Allen reported to the director of nursing at the NECC, who reported to Davis.   Davis Dep. 32:19–23.

On April 12, 2012, plaintiff was transferred from the ERDCC to the NECC. Chastain and Pribble 00534–35 [Doc. ##72-5-6, 78-2-3].   At the NECC, plaintiff was enrolled in a chronic care clinic for diabetes and the internal medicine chronic care clinic in relation to his need for colostomy supplies following the removal of his colon.   Allen Dep. 11:5–13; Crew Dep. 87:25–88:10 [Doc. ##72-4, 78-1].   Plaintiff's colostomy supplies include colostomy bags, wafers, paste, adhesive remover pads, and towelettes.   Crew Dep. 87:25–88:10.   When plaintiff needs additional colostomy supplies, he is responsible for preparing and submitting a medical services request (MSR), identifying the supplies he needs.   Allen Dep. 25:17–26:19; Crew Dep. 87:14–24; Davis Dep. 47:22–48:16.   Once plaintiff files a MSR, Allen receives and processes the request and schedules plaintiff to pick up the supplies in the medical unit.   Allen Dep. 25:17–26:19.   Davis is responsible for oversight of the medical unit, but she has never provided plaintiff with colostomy supplies and plaintiff has never requested colostomy supplies from Davis.   Crew Dep. 104:6–11. Davis also testified in her deposition that she has never instructed Allen on the distribution of colostomy supplies.   Davis Dep. 45:7–21, 50:2–10.

To ensure plaintiff timely receives his colostomy supplies so he does not run out of the necessary materials, plaintiff was instructed that he needed to file an MSR seven days in advance when he still had a week's supply remaining.   Crew Dep. 96:20–97:6; Allen Dep. 26:16–27:3, 54:10–55:7; cf. Chastain and Pribble 00609 (instruction provided to plaintiff during orientation to the NECC that he needed to notify medical 7–10 days prior to the expiration date on any medications he received).   If an inmate ever has no medical

supplies left, he can self-declare a medical emergency to request new supplies. Allen Dep. 52:11–15.

The colostomy bags and supplies for inmates who need them are kept in a cabinet in the medical unit at the NECC. Allen Dep. 19:15–18. When one set of bags and wafers is remaining in the supply cabinet, Allen reorders colostomy supplies. Allen Dep. 19:15–20:9, 47:15–21. One set consists of ten bags and ten wafers. Id. In her deposition, Davis testified that she could not recall a single instance in which the medical unit ran out of colostomy bags. Davis Dep. 18:21–24. If the medical unit did run out of colostomy supplies, medical staff could either obtain more supplies from an outside pharmacy or another correctional facility nearby. Davis Dep. 20:9–18, 31:23–32:2.

The colostomy bags plaintiff uses are reusable with a drain at the bottom of the bag. Allen Dep. 42:5–22, 43:16–18, 44:5–7; Davis Dep. 16:1–10. The length of time for which a colostomy bag can be reused differs across individuals. Allen Dep. 15:2–19. In her experience, Allen stated that the range of time a bag lasts varies from one day to two weeks. Id. Plaintiff changes his colostomy bag every other day. Crew Dep. 93:5–7. Inmates who use colostomy supplies at the NECC typically receive ten colostomy bags and ten wafers, one full set, when they need new supplies. Allen Dep. 19:15–20:9. Thus, plaintiff needs new supplies approximately every 20 days. Crew Dep. 95:2–97:2.

Plaintiff's medical records show that he picked up his colostomy supplies from Allen on May 26, June 4, 19, July 13, 31, August 8, 30, September 14, 28, October 17, November 12, December 18, 2012, January 10, October 4 and 30, 2013. Chastain and Pribble 00545–79, 00046–50. Plaintiff picked up his colostomy supplies from other nurses on May 3, 15, 16, August 21, 2012, January 27, February 5, March 14, April 15, 30, May 14, June 5, and July 17, 2013. Id. at 00542–57, 00009–45. Plaintiff did not show up to pick up his colostomy supplies on July 11, September 12, 2012, and October 18,

2013.  Id. at 00049, 00554, 00558.  Accordingly, the record shows that across a span of 522 days, on average plaintiff picked up new colostomy supplies from the medical unit approximately every 19 days.

On May 4, 2012, plaintiff told an attending nurse that he was supposed to be given baby wipes to use with his colostomy bags.  Chastain and Pribble 00542; Crew Dep. 120:2–20.  However, the nurse checked with administration and noted that plaintiff did not have physician approval to get baby wipes.  Chastain and Pribble 00542.  Thus, he was provided towelettes and instructed to use soap and water to clean his skin and stoma instead.  Id.; Allen Dep. 52:16–53:23; Crew Dep. 88:25–89:11, 90:9–91:3.  Plaintiff chooses to use toilet paper as an alternative to the towelettes.  Crew Dep. 89:13–17, 91:4–13.  The small towelettes are still accessible to him in the medical unit if he requests them.  Crew Dep. 124:4–10.

While the colostomy bags at the NECC are the same size with respect to capacity, the wafers are varied in size to match the size of the inmate's stoma and the interface on the bag.  Allen Dep. 20:11–21:4, 34:17–36:1; Crew Decl. ¶8 [Doc. #78-6].  A colostomy bag is sealed to plaintiff's skin around his stoma by using the wafers and tape.  Crew Decl. ¶8.  On August 8, 2012, per plaintiff's request, medical staff ordered larger sized wafers for plaintiff.  Allen Dep. 34:17–35:7.  They also provided him with barrier strips, since plaintiff complained that he was having trouble with wafers leaking around the edges.  Allen Dep. 35:8–18.  Barrier strips are placed around the stoma site before the wafer is placed on to help prevent leaking.  Id.  When medical staff tried switching him to a less expensive brand of colostomy bag, plaintiff notified them that the cheaper bags did not work for him and he was switched back to the more expensive brand of bags.  Crew Dep. 101:13–102:7, 103:15–21, 106:12–14.  On August 30, 2012, Allen provided plaintiff a bottle of odor control solution to quell any odors in his cell.  Chastain and

Pribble 00558; Allen Dep. 38:13–25. On November 12, 2012, Allen provided plaintiff Karaya paste for plaintiff to place on his skin before he applied the wafer to obtain a better seal and prevent leakage around the area. Chastain and Pribble 00579; Allen Dep. 17:2–11.

Plaintiff claims that he was denied colostomy supplies on two occasions. The first incident occurred on a weekend. Crew Dep. 95:23–96:7, 99:8–10. Plaintiff ran out of wafers and self-declared a medical emergency. Id. Correctional officers told plaintiff that the chronic care clinic was closed and they did not have the key to access the supply cabinet in the clinic. Crew Dep. 96:9–12, 111:20–112:15. It is undisputed that neither Allen nor Davis was present at the NECC that weekend. Crew Dep. 97:18–20. In a separate incident, plaintiff submitted an MSR for additional colostomy supplies, but Allen was on vacation. Crew Dep. 97:24–98:8. He then had to wait four or five days for new supplies. Crew Dep. 98:10–11.

As a matter of law, the Court finds that the facts in the record related to defendants' provision of colostomy supplies to plaintiff do not support a claim of deliberate indifference to his medical needs. It is undisputed that the NECC's medical unit had a process in place by which plaintiff could request new colostomy supplies as frequently as he needed them. Plaintiff was aware that he was responsible for ordering his colostomy supplies, aware of the process for requesting medical supplies, and aware that he was expected to place his order by filing a medical services request at least one week before his supplies ran out. When plaintiff requested a different size of wafers, a different brand of bags, or additional supplies such as paste or odor control solution, Allen and medical staff ordered these new supplies for him or made alternative supplies available to him.

Additionally, the medical record indicates that plaintiff received new colostomy supplies as frequently as he stated he needed them. Allen told plaintiff that other

inmates usually reused their colostomy bags for four or five days, but there is no evidence in the record that she insisted or forced him to reuse the bags for that length of time. Plaintiff stated that he changed his bag and wafer every other day. The record shows he typically received ten bags and ten wafers when he picked up new supplies from the medical unit. Thus, he generally needed new supplies every 20 days. From May 26, 2012 through October 30, 2013 he received new supplies on average every 19 days. Each time he filed an MSR or self-declared a medical emergency for supplies, his request was addressed.

The two occasions plaintiff unexpectedly ran out of supplies and did not immediately receive new supplies demonstrate, at most, an ineffective process in light of plaintiff's inability to follow the requisite procedure for filing a medical request in advance. It is undisputed that neither Davis nor Allen was present at work when these incidents occurred, and thus neither directly denied plaintiff access to his supplies. Both incidents would have been avoided if plaintiff had properly complied with the medical unit's policy of placing a request for new supplies seven days in advance, or if other medical staff had access to the cabinet in the medical unit containing the colostomy supplies on weekends and occasions when Allen was not at work. While the policy in place for requesting medical supplies at the NECC may be inefficient or demonstrate negligence toward inmates' needs and abilities, these two incidents do not demonstrate that Allen or Davis possessed a mental state akin to criminal recklessness toward plaintiff's medical needs.

With respect to defendants' instructions regarding the use of plaintiff's colostomy supplies, Allen stated that she educated plaintiff on how to use and empty his colostomy bag. Allen Dep. 49:4–50:4. To empty the bag when it either became full or bothered him, Allen stated that she instructed plaintiff to empty its contents into the toilet through the drain at the bottom of the bag, use toilet paper to wipe off the end of the bag, throw

the toilet paper in the toilet, flush the toilet, clamp the end of the bag shut and continue wearing the bag.  Id.  Allen claims that she never instructed plaintiff to rinse the bag out in the sink.  Allen Dep. 49:4–50:4, 58:7–9.  Each box of colostomy bags plaintiff received included instructions on how to use and care for the colostomy bag.  Ex. F [Doc. #72-7];  Crew Dep. 100:20–101:11;  Allen Dep. 50:5–20.  The manufacturer's instructions only reference how a user should empty a bag's contents into the toilet; they do not instruct a user to rinse or clean the colostomy bag in a sink.  Ex. F.

Plaintiff states that he cleaned his colostomy bag out in the sink in his cell once after Allen told him to clean it out in the sink.  Crew Dep. 112:16–113:23.  He states that he cleaned the bag out in the sink because it smelled bad and he did not have a new colostomy bag to change his old bag out.  Crew Dep. 112:16–113:4.  Allen was on vacation at this time and no one else at the prison could provide new supplies for him.  Crew Dep. 114:2–11.  Plaintiff thus proceeded to empty the contents of his bag into the toilet, and then rinsed the inside of the bag out with water in the sink.  Crew Dep. 107:1–20.  In her deposition, Davis stated that inmates who use colostomy bags empty the contents into the toilet, and then use soap and water to rinse the bags in the sink.  Davis Dep. 16:13–20, 33:24–35:10.  However, Davis does not provide one-on-one medical care education or instructions to inmates at the NECC, which is primarily the duty of the chronic care nurse and the receiving and orientation nurse.  Davis Dep. 28:22–29:5, 42:3–11, 44:11–25.

Even accepting plaintiff's version of the facts as true, Allen's single occasion of instructing plaintiff to rinse out his colostomy bag in the sink of his cell does not rise to the level of deliberate indifference to plaintiff's medical needs.  Plaintiff does not contend that Allen told him or expected him to regularly clean out his bag in his cell's sink.  The instructions included with each set of colostomy bags also do not instruct users to clean

out the inside of the bag in a sink. On the single occasion plaintiff chose to rinse out the bag in his cell's sink, he did so because he had failed to timely file a medical services request to avoid running out of new bag supplies. Additionally, because Allen's conduct does not constitute a constitutional violation, Davis's acknowledgment that inmates could be expected to follow Allen's instructions regarding the care of their colostomy bags does not result in individual liability as Allen's supervisor. See Brockinton v. City of Sherwood, Ark., 503 F.3d 667, 673 (8th Cir. 2007) (stating that a supervisor may be held liable under § 1983 if she directly participated in a constitutional violation, exhibited deliberate indifference in training or supervising the subordinate that caused the violation, or for tacit authorization of the offensive acts). Similar to the process in place at the NECC for plaintiff to obtain new medical supplies, defendants' conduct with respect to any instructions they provided to plaintiff regarding the use of his colostomy bag at most constitutes negligence. See Popoalii, 512 F.3d at 499 ("For a claim of deliberate indifference, 'the prisoner must show more than negligence, more even than gross negligence . . . .'") (quoting Estate of Rosenberg, 56 F.3d at 37). Accordingly, defendants Allen and Davis are entitled to judgment as a matter of law with respect to plaintiff's claim of deliberate indifference against them.

Because the Court finds that Allen and Davis are entitled to judgment as a matter of law for the reasons discussed above, it is unnecessary to address defendants' other bases for summary judgment.

\*       \*       \*       \*       \*

For the reasons stated above,

**IT IS HEREBY ORDERED** that the motion for summary judgment [Doc. #68] is **granted** as to defendants Pascha Allen and Roschell Davis and is **denied** as to defendant Charles Chastain.

**IT IS FURTHER ORDERED** that the motion of defendant Margaret Huff for summary judgment [Doc. #70] is **granted**.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 10th day of December, 2015.